******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# GERIATRICS, INC. *v.* HELEN MCGEE ET AL.
## (SC 20047)

Palmer, McDonald, Robinson, D'Auria,
Mullins, Kahn and Ecker, Js.*

*Syllabus*

Pursuant to a provision of the Connecticut Uniform Fraudulent Transfer Act (CUFTA) (§ 52-552e [a] [1]), a transfer by a debtor is fraudulent as to a creditor, if the creditor's claim arose before the transfer was made and if the debtor made the transfer with actual intent to hider, delay or defraud any creditor of the debtor.

The plaintiff, a nursing home operator, sought to recover damages for, inter alia, the alleged breach of a residency agreement executed by the named defendant, H, upon her admission to one of the plaintiff's nursing homes. Before H was admitted to the plaintiff's facility, H's son, the defendant S, began to manage her finances under a power of attorney that she had given to him, which included access to her bank accounts. Under the residency agreement, to which S was not a party, H agreed to pay for the costs associated with her residency and related care. The plaintiff alleged, with respect to H, breach of contract and unjust enrichment owing to her failure to pay for services rendered to her by the plaintiff. With respect to S, the plaintiff alleged unjust enrichment and a violation of CUFTA on the basis that H had transferred assets to S, those transfers left H with insufficient assets to pay her debts, the transfers were made with the intent to hinder H's creditors, and S had provided nothing in exchange for the assets he received. At trial, the plaintiff introduced checks issued after H had been admitted to the nursing home that were payable to S or his wife. The checks totaled about $73,000 and were drawn on H's bank accounts and signed by S with the designation for power of attorney. S also exercised his power of attorney to pay some of H's past and present expenses directly to other creditors. S's deposition testimony, which was admitted at trial, indicated that he had a verbal agreement with H to receive payment for his power of attorney services in the amount of $600 per month and that H had agreed that he could allocate money to himself for the care that he provided to her in her home before she was admitted to the nursing home. There was no claim by H's counsel that S lacked authority to make the transfers to himself on H's behalf or that he otherwise engaged in any wrongdoing in connection with those transfers. The trial court rendered judgment for the plaintiff on its breach of contract claim against H and for S on both the CUFTA and unjust enrichment counts against him. The court reasoned that CUFTA did not apply to the transfers made by S because S was not a debtor of the plaintiff, and CUFTA did not apply to third-party transferors, such as S. The court also determined, with respect to the plaintiff's unjust enrichment claim against S, that both the plaintiff and S had a right to H's assets but that the plaintiff had failed to prove that the plaintiff had the better legal or equitable right to H's assets than S did. On the plaintiff's appeal from that portion of the trial court's judgment relating to the plaintiff's claims against S, *held*:

1. The trial court improperly rejected the plaintiff's fraudulent transfer claim on the ground that S's transfers of H's assets pursuant to a power of attorney were not transfers made by a debtor, and, accordingly, the trial court's judgment as to the plaintiff's CUFTA claim was reversed and the case was remanded for a new trial on that claim at which the court must determine whether such transfers were fraudulent under any of the theories advanced by the plaintiff: the trial court improperly failed to consider the agency relationship between H and S created by the power of attorney and to apply agency principles when it determined that H's assets had been transferred by a third party rather than by the debtor; moreover, this court's review of the relevant provisions of CUFTA, including the provision (§ 52-552k) providing that the law relating to principal and agent supplements the provisions of CUFTA, unless displaced by its provisions, led it to conclude that the requirement in § 52-552e (a) that the fraudulent transfer be made "by a debtor"

encompasses a transfer made by a person authorized by a power of attorney to make such a transfer on behalf of the debtor, there having no basis to conclude that the application of agency principles in this context was inconsistent with the provisions of CUFTA or conflicted with its policies of protecting creditors and suppressing fraud.

2. The trial court properly rendered judgment for S on the plaintiff's unjust enrichment claim: the trial court's finding that S, as well as the plaintiff, had an interest in H's assets was not clearly erroneous, as the court was free to consider the absence of a claim by H that S improperly transferred assets to himself and to credit S's deposition testimony, which was admitted into evidence by the parties' mutual agreement, that he used the money from H's accounts to compensate himself for the care he had provided to H before she was admitted and for the continued management of her personal and financial affairs; moreover, the trial court did not abuse its discretion in determining that the plaintiff had failed to prove that it, rather than S, had the better legal or equitable right to H's assets.

*(Three justices concurring in part and dissenting in part in one opinion)*

Argued April 4, 2018—officially released June 18, 2019

*Procedural History*

Action to recover damages for, inter alia, breach of contract, and for other relief, brought to the Superior Court in the judicial district of New Britain and tried to the court, *Morgan, J.*; judgment in part for the plaintiff, from which the plaintiff appealed. *Reversed in part*; *new trial.*

*Andrew P. Barsom*, for the appellant (plaintiff).

*Jeremy S. Donnelly*, for the appellee (defendant Stephen McGee).

*Opinion*

McDONALD, J. The Connecticut Uniform Fraudulent Transfer Act (CUFTA or act), General Statutes §§ 52-552a through 52-552*l*, provides relief to unsecured creditors when there has been a transfer of a debtor's assets and the circumstances establish that the transfer was fraudulent. The principal issue in this appeal is whether it would be improper to impute to the debtor a transfer of the debtor's assets by the debtor's agent under the law of agency. The act directs courts to apply the law of principal and agent unless such law is "displaced by" the provisions of the act. General Statutes § 52-552k.

The defendant Stephen McGee used a power of attorney granted to him by his elderly mother, the named defendant, Helen McGee (Helen), to transfer to himself funds from Helen's checking account, claiming that Helen had authorized him to reimburse himself for various services that he had provided or was continuing to provide to her. As a consequence of those transfers, Helen had insufficient assets to pay her debt to the plaintiff, Geriatrics, Inc., the owner and operator of a nursing home in which Helen resided for a period of time. The plaintiff appeals from the judgment of the trial court insofar as it rendered judgment in the defendant's favor on counts alleging fraudulent transfer under CUFTA and unjust enrichment. We conclude that the trial court, in rejecting the plaintiff's CUFTA claim, improperly failed to consider and apply agency principles when it decided that Helen's assets had been transferred by a "third party," the defendant, and not by the debtor, Helen. We further conclude that, in light of certain unrebutted evidence, the trial court did not abuse its discretion in rejecting the plaintiff's unjust enrichment claim. Therefore, we reverse in part and affirm in part the trial court's judgment.

The record reveals the following undisputed facts. In late 2012, the defendant began to manage Helen's finances under a power of attorney.[1] In February, 2013, Helen was admitted to Bel Air Manor, a skilled nursing home operated by the plaintiff, and she agreed to pay for residency and related care. The defendant was not a party to this agreement. Although Medicare and private insurance paid Helen's expenses for the first nine months at Bel-Air Manor, she began accumulating debt once those benefits were exhausted.[2]

In June, 2015, the plaintiff commenced the present action against Helen[3] and the defendant. In the counts brought against Helen, the plaintiff alleged that Helen had breached the residency agreement and had been unjustly enriched by her failure to pay in excess of $153,000 for services provided to her to date. In the counts against the defendant, the plaintiff alleged that Helen had transferred assets to the defendant, an "insider" under CUFTA; that those transfers left Helen

with insufficient assets to pay her debts; that those transfers were made with the intent to hinder Helen's creditors; and that the defendant had provided nothing in exchange for the funds he received. The plaintiff alleged that this conduct constituted a fraudulent transfer in violation of CUFTA and resulted in the defendant's unjust enrichment.[4] The defendant admitted in his answer that Helen had transferred assets to him but denied the other substantive allegations.

At trial, the plaintiff introduced checks drawn on bank accounts in Helen's name, signed by the defendant with the designation "POA" (power of attorney). Some of the checks named various businesses as payees; forty-eight of the checks, issued over a three year period and totaling approximately $73,000, named the defendant or his wife as payee.[5]

The defendant did not testify at trial. He was unavailable due to illness, and his deposition was admitted into evidence by stipulation. In that deposition, the defendant testified that, in late 2012, he began to manage Helen's finances under a power of attorney agreement that Helen had given. He testified that various checks likely had been or were issued as payment for his power of attorney services, for which he charged $600 a month.[6] The defendant testified that he and Helen had made a verbal agreement that he would receive monthly fees for such services, and that the power of attorney agreement reflected that he could charge fees. The defendant also testified that he had cared for Helen before she was admitted to Bel Air, and that he and Helen had a verbal agreement that he could take "whatever's due [to him]" for the personal care that he had provided. The defendant estimated the value of that care to be approximately $230 per day, based on the rate for comparable professional services.

No testimony was received from Helen. She died a few months before trial commenced in September, 2016, and was never deposed.[7] However, Helen's interests were represented by counsel throughout the proceedings.[8] No cross claim was made on Helen's behalf against the defendant asserting either that he lacked authority to make the transfers to himself on her behalf or that he otherwise engaged in any wrongdoing in connection with these transfers.

After the parties filed posttrial briefs, the court issued an order directing the plaintiff to file a supplemental brief clarifying the specific provisions of CUFTA on which it was relying and the factual and legal basis for each such claim. The court permitted the defendant to file a responsive supplemental brief. The plaintiff's supplemental brief asserted that the evidence at trial satisfied four statutory grounds—General Statutes §§ 52-552e (a) (1) and (2), and 52-552f (a) and (b). The court did not ask the parties to address, and neither party's brief did address, the significance, if any, of

the fact that the transfers had been executed by the defendant pursuant to a valid power of attorney.

The trial court rendered judgment in favor of the plaintiff on the breach of contract count against Helen on the basis of a stipulation in which Helen's counsel conceded liability on that count. The court rendered judgment for the defendant on all counts brought against him.

In its memorandum of decision, the trial court made the following findings of fact, which were based solely on the defendant's deposition testimony.[9] When Helen's health first began to deteriorate, the defendant moved into her home to provide twenty-four hour a day care. He mainly offered physical aid, such as cooking and ordering groceries, bathing her, dressing her, and dealing with her incontinence. The defendant's wife assisted with Helen's care. This arrangement lasted for approximately two years. At that point, the defendant was no longer able to care for Helen because of his own debilitating disease and hired private caretakers to provide home care for her.

After Helen was admitted to Bel-Air Manor in early 2013, the defendant and his wife continued to provide care to Helen in the form of managing her personal and financial affairs. At this time, the defendant held power of attorney for Helen and the power of attorney provided the defendant with access to the bank accounts in which Helen's Social Security and pension benefits were electronically deposited. The defendant exercised the power of attorney to pay some of his mother's past and present expenses directly to her creditors. From March, 2013 to March, 2016, the defendant, "acting under the power of attorney for Helen," also wrote checks to himself and to his wife totaling approximately $73,000. The defendant and his wife used those funds to compensate themselves for the care that they had provided to Helen before and after her admission to Bel Air, to pay the defendant $600 a month for services as power of attorney, and as reimbursement for money loaned to Helen or spent on her behalf.[10]

On the basis of these facts, the court reached the following conclusions. With regard to the fraudulent transfer claim, although all of the parties' filings and argument to the court proceeded from the view that Helen transferred the assets, the trial court on its own initiative raised the issue of whether the defendant himself was the transferor was with regard to these transactions in light of his testimony.[11] The court noted that it was not Helen, the debtor, who had actually executed the transfers, but instead it was the defendant, a "third party transferor." The court raised the issue because of language in CUFTA that provides for recovery when there is a transfer "made . . . by a debtor"; General Statutes §§ 52-552e and 52-552f; and which defines "[d]ebtor" as "a person who is liable on a claim." Gen-

eral Statutes § 52-552b (6). The court then reasoned "that the act does not apply to the alleged transfers at issue in this case because [the defendant] is not a debtor of the plaintiff as that term is defined in the act, and the plain and unambiguous language of the act does not apply to third-party transferors." The court did not appear to consider whether the defendant's status as Helen's attorney-in-fact distinguished him from third parties generally. The court cited cases reasoning that the act could apply to a transfer made by a third party if the debtor "participated" in the transfer but found no evidence that Helen had "participated in any fashion in the claimed fraudulent transfers . . . ." Accordingly, the trial court held that the plaintiff had failed to make out a claim under CUFTA.

With regard to the unjust enrichment claim, the trial court agreed that the plaintiff had a right to Helen's assets because of its contract with her, but it found that the defendant also had a right to those assets because of the services and loans he had provided to Helen before and after the debt to the plaintiff arose. On the basis of these facts, the court concluded that the plaintiff had failed to prove it had "a better legal or equitable right" to Helen's assets than did the defendant. The trial court therefore held that the plaintiff had not established that the defendant was unjustly enriched at the plaintiff's expense.

The plaintiff appealed from the judgment of the trial court with regard to the CUFTA and unjust enrichment counts rendered in the defendant's favor. We transferred the appeal from the Appellate Court to this court. See General Statutes § 51-199 (c); Practice Book § 65-1.

I

We begin with the fraudulent transfer claim. The plaintiff advances several arguments as to why the trial court improperly determined that there was not a transfer by Helen, as debtor, and therefore no liability under CUFTA. We need only reach one of those arguments, namely, that the trial court improperly failed to consider the defendant's status as Helen's attorney-in-fact and to apply agency principles in its analysis of the plaintiff's claim.[12]

Whether CUFTA's requirement that the fraudulent transfer be "made by the debtor" encompasses a transfer made by a debtor's attorney-in-fact presents a question of statutory interpretation, to which we apply well established rules of construction and exercise plenary review. See General Statutes § 1-2z (plain meaning rule); *Canty* v. *Otto*, 304 Conn. 546, 557–58, 41 A.3d 280 (2012) (general rules of construction aimed at ascertaining legislative intent).

CUFTA provides relief to an unsecured creditor when there has been a "transfer made . . . by a debtor" and that transfer is "fraudulent . . . ." General Statutes

§§ 52-552e and 52-552f. Although the present case turns on the first requirement—the trial court never reached the second—statutory meaning is always contextual. See General Statutes § 1-2z (directing court to consider related statutes to ascertain meaning). Therefore, we consider the framework of the entire act before turning to the specific question raised on appeal.

To establish that a transfer is fraudulent, the creditor may, but need not, prove actual fraudulent intent. See General Statutes § 52-552e (a) (1) and (b) (transfer made with "actual intent to hinder, delay or defraud any creditor").[13] Liability also can be established on the basis of constructive fraud when a transfer of the debtor's assets occurs after the creditor's claim arose and other circumstances are present, including that the debtor has not received reasonably equivalent value in exchange for the transfer, that the transfer renders the debtor insolvent (i.e., greater debts than assets), and/ or that the transfer is made to an insider, such as the debtor's relative.[14] See General Statutes § 52-552e (a) (2); General Statutes § 52-552f (a) and (b); see generally *Badger State Bank* v. *Taylor*, 276 Wis. 2d 312, 328, 688 N.W.2d 439 (2004) ("[I]ntent is difficult to prove, and the drafters of the [Wisconsin] Uniform Fraudulent Transfer Act included provisions addressing transactions that might be considered wrongful toward creditors even if a debtor's intent to hinder, delay, or defraud is not proven. The focus in constructive fraud shifts from a subjective intent to an objective result. Proof of constructive fraud simply entails proof of the requirements of the statute." [Footnotes omitted; internal quotation marks omitted.]). When a creditor proves that a fraudulent transfer has occurred, the court may order avoidance of the transfer to the extent necessary to satisfy the creditor's claim, or may order various remedies to secure the asset from being dissipated. See General Statutes § 52-552h. Defenses and various other protections are available to a transferee who has taken the assets in good faith and under certain other circumstances. See General Statutes § 52-552i.

Significantly for purposes of the present case, the act makes clear that its provisions are not the exclusive source of law governing fraudulent conveyances. General Statutes § 52-552k provides in relevant part: "Unless displaced by the provisions of [this act], the principles of law and equity, including . . . the law relating to principal and agent . . . supplement the provisions of said sections."[15] That common-law principles and defenses supplement CUFTA is consistent with our recognition that CUFTA "is largely an adoption and clarification of the standards of the common law of [fraudulent conveyances]," except that the act's remedies are broader than those available under the common law. (Emphasis omitted; internal quotation marks omitted.) *Robinson* v. *Coughlin*, 266 Conn. 1, 9, 830 A.2d 1114 (2003).

This supplementary provision is relevant to the present case because a grant of a power of attorney creates a principal-agent relationship. "Under our common law, a power of attorney creates a formal contract of agency between the grantor and his [attorney-in-fact]. *Long* v. *Schull*, 184 Conn. 252, 256, 439 A.2d 975 (1981). Under our statutory law, this agency relationship encompasses a variety of transactions that the grantor presumptively has authorized his [attorney-in-fact] to undertake on his behalf. General Statutes [(Rev. to 2009)] § 1-42 et seq."[16] *Kindred Nursing Centers East, LLC* v. *Morin*, 125 Conn. App. 165, 167, 7 A.3d 919 (2010); see also 2A C.J.S. 589–90, Agency § 23 (1972) ("An attorney-in-fact is one who is given authority by his principal to do a particular act not of a legal character; a person appointed by another by a letter or power of attorney to transact any business for him out of court. . . . [A]ttorneys-in-fact created by formal letters of attorney are merely agents, and their authority and the manner of its exercise are governed by the principles of the law of agency." [Footnotes omitted.]). Our statutory law recognized that, when an attorney-in-fact undertakes transactions in that capacity, he is acting as the "alter ego of the principal . . . ." General Statutes (Rev. to 2015) § 1-55.

In light of the agency relationship created between Helen and the defendant pursuant to the power of attorney, under which the law of agency generally would impute to Helen the defendant's transfers of Helen's assets, we must consider whether this application of agency law is displaced by the provisions in the act. Guidance as to what the phrase "displaced by" means is available in a comment to an identical provision in the Uniform Commercial Code (UCC) incorporating common-law principles and defenses. See General Statutes § 42a-1-103 (b); see also General Statutes § 50a-64 (incorporating same supplementary principles for Uniform Foreign-Money Claims Act, General Statutes § 50a-50 et seq.). That comment explains that these common-law principles would be displaced if they were inconsistent with a provision of the UCC or the UCC's principles and policies. See comment (2) to Uniform Commercial Code § 1-103, Conn. Gen. Stat. Ann. § 42a-1-103 (b) (West 2009) p. 21.

The policy underlying the act—protecting unsecured creditors from debtors who place assets beyond the reach of their unsecured creditors[17]—undoubtedly is best served by applying the law of agency to the matter at hand. See *Badger State Bank* v. *Taylor*, supra, 276 Wis. 2d 330 ("The Uniform Fraudulent Transfer Act [(1984), 7A U.L.A. 274 (1999)] reflects a strong desire to protect creditors and to allow for the smooth functioning of our [credit based] society. It is a creditor-protection statute. Without such protection for creditors, [c]reditors would generally be unwilling to assume

the risk of the debtor's fraudulent transfers." [Footnotes omitted; internal quotation marks omitted.]). The words of this court regarding our original fraudulent conveyance statute apply equally to CUFTA: "As the statute was enacted for the suppression of fraud, the advancement of justice and the promotion of the public good, it should be liberally and beneficially construed to suppress the fraud, abridge the mischief and enlarge the remedy. . . . [T]he common law . . . supplements the statute to the end that justice may be done." (Citations omitted; internal quotation marks omitted.) *Allen* v. *Rundle*, 50 Conn. 9, 32 (1882). Given that the failure to apply the law of agency would create an easy end run around the act, and frustrate the ability of creditors to secure payment for debts owed to them, application of agency principles is manifestly consistent, not inconsistent, with the policies underlying the act. We cannot hypothesize a single adverse consequence that would arise from applying agency law under these circumstances.

Despite the fact that application of agency law would advance the policies underlying the act, we are bound to consider whether its application would be inconsistent with any specific provisions of the act. To this end, we observe that, even in the absence of this supplementary provision, this court has recognized "the general rule that [*u*]*nless a statute provides to the contrary* . . . principals may act through agents . . . ." (Citations omitted; emphasis added; internal quotation marks omitted.) *Rich-Taubman Associates* v. *Commissioner of Revenue Services*, 236 Conn. 613, 619, 674 A.2d 805 (1996); see, e.g., id., 620–21 ("Applying the law of agency to the tax statutes, we conclude that the plaintiff, concededly acting as the city's agent when purchasing materials and services for the parking garage, is not liable for use taxes on purchases made within the scope of its authority. . . . [General Statutes §] 12-412 [1] does not abrogate the [common-law] rule of agency that the actions of an agent, who is acting for a disclosed principal, are, as a matter of law, the actions of the principal." [Citation omitted.]). There is no provision in CUFTA that explicitly or even implicitly provides that acts of the debtor's agent shall not be imputed to the debtor.

Nor do we infer any inconsistency from the fact that the act applies to "[a] transfer made or obligation incurred by a debtor"; General Statutes §§ 52-552e and 52-552f; and defines a debtor, unsurprisingly, as "a person who is liable on a claim." General Statutes § 52-552b (6). It would make no sense for the act to define debtor to include the debtor's agent, because an agent is not liable for the principal's debt. See *Rich-Taubman Associates* v. *Commissioner of Revenue Services*, supra, 236 Conn. 619 ("the agent is not liable where, acting within the scope of his authority, he contracts with a third party for a known principal" [internal quota-

tion marks omitted]); see also 2 Restatement (Third), Agency §§ 6.01 through 6.04, pp. 3–55 (addressing principal and agent liability for contracts executed by agent). It would similarly be illogical to include the debtor's agent in the substantive provisions of the act (i.e., "transfer made or obligation incurred by a debtor *or the debtor's agent*" [emphasis added]). Agency law dictates when an agent's acts shall be imputed to the principal and the limited circumstances under which an agent can be liable for a principal's debt. See, e.g., 2 Restatement (Third), supra, §§ 6.02 through 6.04, pp. 28–55 (addressing agent's liability when principal is unidentified or undisclosed or lacks capacity to be party to contract). Surely, we would not disregard agency principles and hold that the *debtor* was not liable on the claim simply because the obligation was executed by the debtor's authorized agent. See, e.g., *Hallas* v. *Boehmke & Dobosz, Inc.*, 239 Conn. 658, 673, 686 A.2d 491 (1997) ("[a] principal is generally liable for the authorized acts of his agent" [internal quotation marks omitted]).

It is important to be clear that the CUFTA claim in this appeal does not allege that the defendant/agent is personally *liable* on the claim (i.e., the debt for Helen's nursing home services) and hence *legally is the debtor*. Rather, the claim is that the defendant's act of transferring Helen's assets made under the lawful authority of a power of attorney is an act *imputed to her*. Had the defendant fraudulently transferred Helen's assets to a third party, for example, the CUFTA action would have had to have been brought against that third party, not the defendant. See 37 Am. Jur. 2d 705–706, Fraudulent Conveyances and Transfers § 162 (2013).[18] The plaintiff is not claiming that it has the right to recover from the defendant those assets that were paid to Helen's other creditors, only those assets that he transferred as Helen's attorney-in-fact to himself as transferee.[19] Cf. *Abbott Terrace Health Center, Inc.* v. *Parawich*, 120 Conn. App. 78, 79, 88, 990 A.2d 1267 (2010) (concluding that allegations stated valid cause of action for fraudulent transfer against defendant when complaint alleged, inter alia, that defendant's aunt "acting *through the defendant as her* [*attorney-in-fact*], transferred certain moneys in her bank accounts to the defendant" just before entering into nursing home, transfer of assets rendered aunt unable to meet her financial obligations, and aunt conveyed assets without adequate consideration [emphasis added]).

Additional evidence that application of agency principles would not be inconsistent with the provisions of the act is reflected in the act's definition of "transfer." The term could hardly be defined more broadly: "every mode, direct *or indirect*, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease and creation of a lien or other

encumbrance." (Emphasis added.) General Statutes § 52-552b (12); see *In re Neri Bros. Construction Corp.*, 593 B.R. 100, 141 (Bankr. D. Conn. 2018) (describing identical definition of transfer in federal Bankruptcy Code being "as broad as possible" [internal quotation marks omitted]). This sweeping definition was in fact derived from the United States Bankruptcy Code; see Unif. Fraudulent Transfer Act (1984) § 1, comment (12), 7A U.L.A. 261 (2017); which has a fraudulent conveyance provision similar to the one in CUFTA. See 11 U.S.C. § 548 (2012). In bankruptcy cases in which a transfer has been executed pursuant to a power of attorney, the transfer is imputed to the debtor, such that the case turns exclusively on the question of whether fraud (actual or constructive) has been established under the facts. See, e.g., *In re Simione*, 229 B.R. 329, 330, 335 (Bankr. W.D. Pa. 1999) (trustee for creditors was entitled to judgment in case seeking to avoid transfer executed by debtor's relatives under power of attorney on basis of constructive fraud because "[t]he [t]ransfer caused the [d]ebtor to become insolvent and no reasonably equivalent value was given to the [d]ebtor in exchange for the [t]ransfer"); see also *In re Gordon*, 293 B.R. 817, 822–23 (Bankr. M.D. Ga. 2003) (discussing different approaches taken by courts as to whether fraudulent *intent* of agent may be imputed to debtor in various contexts, including agency in spousal context, and noting that "[o]ne reason courts are hesitant to impute intent is that the marital relationship, by itself, does not always give rise to a legal partnership or agency.").[20] Therefore, we see no basis to conclude that application of agency principles would be inconsistent with the provisions of the act.

The propriety of imputing a transfer made by the debtor's agent to the debtor has even greater force in a case like the present one. The debtor, Helen, was a represented party in this action, and she did not challenge the legality or propriety of the transfers. In effect, Helen's acquiescence ratified the transfers made by the defendant.[21] See *Community Collaborative of Bridgeport, Inc.* v. *Ganim*, 241 Conn. 546, 561–62, 698 A.2d 245 (1997) ("Ratification requires acceptance of the results of the act with an intent to ratify, and with full knowledge of all the material circumstances. . . . [S]ilence, as well as affirmative acts, may imply an intent to ratify." [Citations omitted; internal quotation marks omitted.]).

Finally, we are mindful that a provision in the act directs the court not only to apply and construe its provisions "to effectuate their general purpose," but also "to make uniform the law" among other states enacting them. General Statutes § 52-552*l*. No court, however, has expressly addressed the question before us. Courts in three jurisdictions have treated a transfer by an attorney-in-fact as a transfer subject to the act, as we do here, but without any analysis of that issue.

See *Schempp* v. *Lucre Management Group, LLC*, 18 P.3d 762, 765 (Colo. App. 2000), cert. denied, Colorado Supreme Court, Docket No. 00SC667 (February 26, 2001); *Aristocrat Lakewood Nursing Home* v. *Mayne*, 133 Ohio App. 3d 651, 662–67, 729 N.E.2d 768 (1999); *Rosier* v. *Rosier*, 227 W. Va. 88, 101 n.5, 705 S.E.2d 595 (2010). We surmise that the parties in these cases were operating under the same logical assumption reflected in the parties' pleadings in the present case, that the act of the agent would be imputed to the principal as a matter of law. On the other hand, courts in two jurisdictions have applied the same "plain meaning" analysis that our trial court did, and reached the same conclusion as did the trial court here, but they too did not acknowledge the supplementary provision incorporating agency law, let alone the defendant's status as the debtor's agent. See *Folmar & Associates, LLP* v. *Holberg*, 776 So. 2d 112, 116–18 (Ala. 2000), overruled in part on other grounds by *White Sands Group, L.L.C.* v. *PRS II, LLC*, 32 So. 3d 5, 14 (Ala. 2009); *Presbyterian Medical Center* v. *Budd*, 832 A.2d 1066, 1074 (Pa. Super. 2003).

One court has rejected a creditor's claim that the Uniform Fraudulent Transfer Act provided for recovery against the debtor's attorney-in-fact under agency principles but under materially different circumstances. See *Methodist Manor Health Center, Inc.* v. *Py*, 307 Wis. 2d 501, 514–15, 746 N.W.2d 824 (App. 2008). *Py* addressed a claim of conversion against the debtor's granddaughter, who, pursuant to a power of attorney, executed checks as specifically directed by her grandmother to other persons. Id., 504, 506. The granddaughter was neither the debtor nor the transferee, but the creditor nonetheless sought to recover from her. It was in this context that the Wisconsin Appellate Court expressed the concern that "strictly applying agency principles in this scenario would disfavor unknowing and, in many cases, unsophisticated agents who were doing nothing more than attempting to assist an elderly parent or grandparent with their finances." (Internal quotation marks omitted.) Id., 517; cf. *Badger State Bank* v. *Taylor*, supra, 276 Wis. 2d 322 (citing supplementary provision in context of transfer by president and principal shareholder of corporation acting as agent to principal corporation and stating that "[n]othing in [the applicable fraudulent conveyance provision] indicates that it displaces the law relating to principal and agent").

The facts in *Py* clearly supported the court's determination that no recovery could be had under those circumstances. Nothing in our decision means that an attorney-in-fact can be personally liable on the principal's debt simply because he or she executed the transfers, even if the attorney-in-fact knew that the debtor may thereby be rendered insolvent. See *In re M. Blackburn Mitchell, Inc.*, 164 B.R. 117, 123–24 (Bankr. N.D. Cal. 1994) (citing case law from Seventh and Ninth

Circuit Courts of Appeals for propositions in bankruptcy case that "[a] party who acts as a conduit and who merely facilitates the transfer from the debtor to a third party, is not an 'initial transferee,' " and that court must "examine whether the party receiving the funds exercised dominion or control over the money for its own account, that is, not merely as an agent for a third party").

In sum, applying the law of agency is not inconsistent with the provisions or policies of the act. Not applying the law of agency would, in fact, undermine the purposes of the act without providing any commensurate benefit. If any innocent transferee is the recipient of funds fraudulently transferred by the debtor's agent, the same defenses are available as would have been available to the transferee if the debtor personally executed the transfer. See General Statutes § 52-552i.

We therefore conclude that the trial court improperly rejected the plaintiff's fraudulent transfer claim on the ground that the defendant's transfers of Helen's assets pursuant to a power of attorney were not transfers made by the debtor. On remand, the trial court must determine whether such transfers were fraudulent under any of the theories advanced by the plaintiff.

II

The plaintiff also claims that the trial court improperly rendered judgment for the defendant on the count alleging unjust enrichment. The plaintiff asserts that the trial court incorrectly determined that the plaintiff failed to show it had a better legal or equitable right to Helen's assets than the defendant. The crux of the plaintiff's argument is that the trial court clearly erred when it credited the defendant's testimony establishing his right to the funds he transferred. Because we cannot conclude that the challenged findings were clearly erroneous, the court's determination that the plaintiff failed to establish a superior right to the transferred funds necessarily stands.

A plaintiff may recover for unjust enrichment when a contract remedy is unavailable, to the extent that the defendant has unjustly profited at the plaintiff's expense. *Horner* v. *Bagnell*, 324 Conn. 695, 707–708, 154 A.3d 975 (2017). "Unjust enrichment is, consistent with the principles of equity, a broad and flexible remedy. . . . Plaintiffs seeking recovery . . . must prove (1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment." (Internal quotation marks omitted.) Id., 708.

"Although unjust enrichment typically arises from a plaintiff's direct transfer of benefits to a defendant, it also may be indirect, involving, for example, a transfer of a benefit from a third party to a defendant when the

plaintiff has a superior equitable entitlement to that benefit." *New Hartford* v. *Connecticut Resources Recovery Authority*, 291 Conn. 433, 468, 970 A.2d 592 (2009). In an indirect benefit scenario, the plaintiff must prove that it has "a better legal or equitable right" to the disputed benefit than the defendant. 2 Restatement (Third), Restitution and Unjust Enrichment § 48, p. 144 (2011). This standard is "highly restrictive." Id., comment (i), p. 159. It "refer[s] to a paramount interest of a kind recognized in law or equity—not to the personal merit or desert of the persons involved, or to considerations of fairness independent of preexisting entitlements." Id., comment (a), p. 145. Specifically, the plaintiff must prove that its right "is both recognized, and accorded priority over the interest of the defendant, under the law of the jurisdiction." Id., comment (i), p. 159.

Because the trial court's equitable determinations "depend on the balancing of many factors," we review its ultimate decision as to whether the defendant was unjustly enriched for abuse of discretion. (Internal quotation marks omitted.) *New Hartford* v. *Connecticut Resources Recovery Authority*, supra, 291 Conn. 452. Any subsidiary factual determinations by the trial court, however, are reviewed for clear error. *Connecticut Light & Power Co.* v. *Proctor*, 324 Conn. 245, 258–59, 152 A.3d 470 (2016). A finding is clearly erroneous (1) if there is no evidence in the record to support it, or (2) when, although the record provides some support, the weight of the evidence in the record leaves the reviewing court with a "definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) Id., 259.

The trial court made two relevant findings on this issue. First, it found that the plaintiff had an interest in Helen's assets. Stemming from Helen's breach of the residency agreement, the plaintiff had been undercompensated for more than two years, resulting in unpaid bills of $208,193.

Second, the court found that the defendant also had an interest in Helen's assets. In arriving at this conclusion, it relied on the defendant's deposition testimony, which, as we previously noted, was admitted into evidence by the parties' mutual agreement. For example, the defendant testified that he "lived with [Helen] for over two years and took care of her . . . [twenty-four] hours a day," cooking for her, bathing her, dressing her, and changing her adult diapers until he could no longer do so; that he paid for an in-home care provider and for "all the expenses that were required to keep up the house," such as property tax, oil, utilities, and snow removal; and that he prepared her litigation documents, scheduled her medical appointments, and applied for her financial assistance. The trial court credited this "unrefuted evidence." It found that the defendant used

the money from Helen's accounts to compensate himself for the care he had provided before she was admitted to the plaintiff's facility and for the continued management of her personal and financial affairs, and to reimburse himself for money he had spent on her behalf.

Critically, the trial court concluded: "As between the plaintiff and [the defendant], the plaintiff has not proven that it has a better legal or equitable right to the funds of Helen . . . that were paid to [the defendant] and/ or his wife." In other words, although the plaintiff proved that it had a "recognized" interest in Helen's assets, it did not prove that its interest should be "accorded priority over the interest of [the defendant], under the law of the jurisdiction." 2 Restatement (Third), Restitution and Unjust Enrichment, supra, § 48, comment (i), p. 159. The plaintiff could have met this burden by presenting evidence to discredit the defendant's testimony or by pointing to substantive law or equitable factors that would have given its interest priority over that of the defendant. See, e.g., *Nile* v. *Nile*, 432 Mass. 390, 402, 734 N.E.2d 1153 (2000) (beneficiary of contractual agreement with third party accorded priority over recipients of testamentary gift from third party); *Peirce* v. *Peirce*, 994 P.2d 193, 200 (Utah 2000) (party with contractual right to third party's assets accorded priority over recipient of inter vivos gift from third party). It declined, or neglected, to do so. Indeed, implicit in the court's findings is the recognition that the defendant's interest accrued in large part before the plaintiff's interest began to accrue.

The plaintiff contends, however, that "no evidence" supports the trial court's factual finding that the defendant had an interest in Helen's assets. More particularly, it asserts that the defendant's deposition testimony was "self-serving," vague at points, and uncorroborated by a written contract, a promissory note, receipts, or witnesses.

The plaintiff's claim founders under well settled law. The plaintiff is bound by its stipulation that the deposition testimony could be submitted for the court's consideration. Once in evidence, the trial court was permitted to rely on it to the same extent as if the defendant was present and testifying. See Practice Book § 13-31. Undoubtedly there are facts in the record and evidentiary gaps that reasonably could lead another trier of fact to find the defendant's testimony in whole or part not credible. This court, however, "cannot retry the facts or pass upon the credibility of the witnesses. . . . Rather, [i]t is within the province of the trial court, when sitting as the fact finder, to weigh the evidence presented and determine the credibility and effect to be given the evidence. . . . [I]t is within the province of the trier of fact to accept or reject parts of the testimony of a single witness." (Citations omitted; internal quotation marks omitted.) *In re Gabriella A.*, 319 Conn.

775, 790, 127 A.3d 948 (2015). The trial court therefore was free to credit the defendant's deposition testimony, as well as to take into account the absence of a cross claim by Helen alleging that the defendant improperly transferred assets to himself.

In sum, it was the plaintiff's burden to prove that its rights were superior to those of the defendant. The trial court's factual finding that the defendant had an interest in Helen's assets was supported by the record and, therefore, was not clearly erroneous. As such, the trial court did not abuse its discretion in concluding that the plaintiff failed to prove it had "a better legal or equitable right" to Helen's assets.

The judgment is reversed with respect to the count of the plaintiff's complaint alleging a violation of CUFTA and the case is remanded for a new trial on that count; the judgment is affirmed in all other respects.

In this opinion PALMER, ROBINSON and ECKER, Js., concurred.

* This appeal originally was argued before a panel of this court consisting of Justices Palmer, McDonald, Robinson, D'Auria, Mullins and Kahn. Thereafter, Justice Ecker was added to the panel and has read the briefs and appendices, and listened to a recording of the oral argument prior to participating in this decision.

The listing of justices reflects their seniority status on this court as of the date of oral argument.

[1] The defendant testified that there was a power of attorney agreement, but that agreement was never produced at trial, or at the defendant's deposition, which served as the only source of his testimony. As we explain later in this opinion, the defendant's authority to execute the transfers pursuant to the power of attorney was never disputed by the parties. The trial court expressly found that the transfers were executed pursuant to that authority.

[2] The trial court credited the defendant's testimony that the plaintiff refused to assist the defendant in reapplying for Helen's Medicare benefits, and that the defendant unsuccessfully applied for Medicare benefits on his mother's behalf three times during her stay. At the time of her death, Helen owed the plaintiff approximately $208,000.

[3] The plaintiff named Helen as a defendant individually and in her capacity as trustee of the Helen C. McGee Revocable Trust. Discussion of the matters relating to the trust, which involved the disposition of certain real property, is not necessary to the resolution of this appeal.

[4] The plaintiff also advanced a claim of misrepresentation against the defendant for statements regarding Helen's assets made in a personal financial information form that the defendant signed and submitted to the plaintiff. The trial court rendered judgment in favor of the defendant on this count, finding that he did not know that his statements were false. The plaintiff does not challenge that holding on appeal.

[5] According to the defendant's deposition testimony, many of the checks intended to compensate him were made payable to his wife because he did not maintain a checking account at that time. It appears that the plaintiff's CUFTA claim was based on the transfers issued in the names of both the defendant and his wife. The defendant's wife was not named as a defendant.

[6] The defendant's testimony was inconsistent on this point. He later testified that his fees were $1200 per month.

[7] According to the defendant's deposition testimony, Helen was exhibiting signs of dementia when he lived with her, and that condition became more constant when she entered into the nursing home.

[8] In its memorandum of decision, the trial court noted Helen's death and the fact that the plaintiff did not apply to the trial court for an order to substitute the executor of Helen's estate after Helen died. The trial court found that Helen's and the defendant's interests "were represented by their counsel at trial." Neither the trial court nor the parties otherwise addressed the significance of Helen's death with respect to the action proceeding against her or judgment rendered against her.

[9] Counsel for the defendant and Helen did not call any witnesses to testify, and the only exhibit offered was a statement from Bel Air Manor, dated March 1, 2016, showing a balance due of $166,758.08.

[10] Had the defendant paid himself the $230 daily rate to which he claimed he was entitled for the two years of personal care he had provided to Helen before her admission to Bel Air, that sum would have been $167,900. Payment for the $600 monthly fee for power of attorney services over the approximately three year period Helen resided at Bel Air would have been $21,600. The checks that the defendant issued to himself and his wife over that three year period were for widely varying amounts that did not reflect a clear relationship to these two sums: fifteen were for amounts in excess of $1000; seventeen were for amounts in excess of $2000; and two were for $3000.

[11] We point out that the court raised the issue of who the transferor was, sua sponte, because it seems the likely explanation for the fact that the defendant did not produce, and the plaintiff made no effort to obtain production of, the power of attorney agreement. We also note, however, that we have admonished our courts to give the parties a fair opportunity to provide briefing and/or argument on any issue that the court raises on its own initiative. See *State* v. *Connor*, 321 Conn. 350, 372, 138 A.3d 265 (2016) ("[I]t is clear that, at a minimum, the parties must be provided sufficient notice that the court intends to consider an issue. It is implicit that an opportunity to be heard must be a meaningful opportunity, in order to satisfy concerns of fundamental fairness. . . . The parties must be allowed time to review the record with that issue in mind, to conduct research, and to prepare a response." [Citation omitted; emphasis omitted.]).

[12] The plaintiff also argues that (1) the defendant's admission in his answer that Helen transferred the assets was binding on the trial court, and (2) CUFTA permits liability against a transferee for receipt of those assets, irrespective of who fraudulently transferred them.

[13] General Statutes § 52-552e provides in relevant part: "(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, if the creditor's claim arose before the transfer was made or the obligation was incurred and if the debtor made the transfer or incurred the obligation: (1) With actual intent to hinder, delay or defraud any creditor of the debtor . . . .

"(b) In determining actual intent under subdivision (1) of subsection (a) of this section, consideration may be given, among other factors, to whether: (1) The transfer or obligation was to an insider, (2) the debtor retained possession or control of the property transferred after the transfer, (3) the transfer or obligation was disclosed or concealed, (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit, (5) the transfer was of substantially all the debtor's assets, (6) the debtor absconded, (7) the debtor removed or concealed assets, (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred, (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred, (10) the transfer occurred shortly before or shortly after a substantial debt was incurred, and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor."

[14] General Statutes § 52-552e (a) provides in relevant part: "A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, if the creditor's claim arose before the transfer was made or the obligation was incurred and if the debtor made the transfer or incurred the obligation . . . (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction, or (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due."

General Statutes § 52-552f provides: "(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

"(b) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time and

the insider had reasonable cause to believe that the debtor was insolvent."

[15] General Statutes § 52-552k provides: "Unless displaced by the provisions of sections 52-552a to 52-552*l*, inclusive, the principles of law and equity, including the law merchant and the law relating to principal and agent, estoppel, laches, fraud, misrepresentation, duress, coercion, mistake, insolvency or other validating or invalidating cause, supplement the provisions of said sections."

[16] The Connecticut Statutory Short Form Power of Attorney Act, General Statutes § 1-42 et seq., was repealed in 2016, after the events at issue in the present case. See Public Acts 2016, No. 16-40, § 9.

[17] Although our court has not expressly addressed the purpose of the act, many other jurisdictions have recognized that the purpose of a fraudulent transfer statutory scheme is to prevent debtors from placing assets out of the reach of unsecured creditors. See, e.g., *In re Image Worldwide, Ltd.*, 139 F.3d 574, 578 (7th Cir. 1998); *In re Demitrus*, 586 B.R. 88, 92 (Bankr. D. Conn. February 27, 2018); *Lewis* v. *Superior Court*, 30 Cal. App. 4th 1850, 1873, 37 Cal. Rptr. 2d 63 (1994); *Northwestern Memorial Hospital* v. *Sharif*, 22 N.E.3d 1217, 1223 (Ill. App. 2014); *Leighton* v. *Fleet Bank of Maine*, 634 A.2d 453, 458 (Me. 1993); *Thompson* v. *Hanson*, 168 Wn. 2d 738, 750, 239 P.3d 537 (2009); *Badger State Bank* v. *Taylor*, supra, 276 Wis. 2d 330. This intent is also self-evident in the terms of the act itself.

[18] "In all actions brought by creditors to subject property which it is claimed was fraudulently transferred, the person to whom the property has been transferred is a necessary party. The fraudulent grantee is a necessary party defendant in an action to set aside a conveyance as fraudulent since he or she has an interest in the subject matter of the suit which should not be affected by a decree unless he or she has been given the right to be heard. While a grantee who has parted with possession of the property is a necessary party in some jurisdictions, it is usually the case that he or she no longer has any interest in the subject matter and therefore is not a necessary party. In addition, a grantee who is merely a straw person through which the title is conveyed to another is not regarded as having a sufficient interest in the property to necessitate making him or her a party to the action." (Footnotes omitted.) 37 Am. Jur. 2d, supra, § 162, pp. 705–706.

"In the case of a debtor who has retained no legal interest in the property conveyed, there is a conflict of authority as to whether that person is a necessary party defendant to an action to set aside a fraudulent conveyance. In some jurisdictions, apparently on the theory that having parted with all interest in the property the grantor can no longer be affected by any decree pertaining to the property, the debtor is not a necessary party to the action although the debtor may be a proper party. Under other authority, the debtor, as the originator of the fraudulent conduct complained of, and as the person directly involved in the fraud in the first instance, is a necessary party to the action. Of course, where it appears that the debtor has retained some interest in, or control over, the property conveyed, the debtor is a necessary party to any suit involving such property.

"Where the creditor has not reduced its claim to judgment, the debtor is an indispensable party since, in such circumstances, the debtor has the right to be heard in regard to the validity or amount of the claim. Conversely, it has been found that where the plaintiff's claim has been reduced to judgment, it is not necessary to make the debtor a party." (Footnotes omitted.) 37 Am. Jur. 2d, supra, § 163, p. 707.

[19] The trial court's legal error in the present case may have stemmed from a misunderstanding of the basis of the plaintiff's CUFTA claim. The plaintiff's complaint makes clear that it sought to recover under CUFTA for the funds transferred to the defendant only (directly or indirectly through his wife). An exhibit submitted by the plaintiff listed only those transfers made to the defendant or his wife. The trial court, however, stated in its analysis of the CUFTA claim: "[The defendant], acting as attorney-in-fact for Helen McGee, transferred various funds to himself, his wife, *and others* beginning in August, 2012, and continuing throughout this litigation. The plaintiff asserts its fraudulent transfer claims against [the defendant], the third party *transferor*, and not Helen McGee, the debtor. Consequently, the court must first consider whether the act applies to the transfers at issue in this case." (Emphasis added.) It appears that the trial court failed to recognize that the CUFTA claim was based on the defendant's status as transferee, not transferor, and was limited to transfers made to himself and his wife.

[20] Some bankruptcy cases require additional facts beyond the mere agency relationship when the question is whether the agent's *intent* may be imputed to the principal to prove actual, rather than constructive, fraudulent intent.

Although there is no universal rule, several bankruptcy cases hold that actual fraudulent intent by the debtor's agent may be imputed to the debtor if the agent is the transferee of the assets and retains substantial control over the debtor. See, e.g., *In re Tribune Co. Fraudulent Conveyance Litigation*, Docket No. 11-MD-2296 (RJS), 2017 WL 82391, *5 (S.D.N.Y. January 6, 2017); *In re Elrod Holdings Corp.*, 421 B.R. 700, 711 (Bankr. D. Del. 2010). Surely, if the mere act could not be imputed, there would be no need to consider whether intent could be imputed. See generally 6 A. Resnick & H. Sommer, Collier on Bankruptcy (16th Ed. 2009) § 727.02 [4], p. 727-23 ("A transfer of the debtor's property by an agent or employee with general authority upon the subject will bar the debtor's discharge if the transfer was made within the statutory period with intent to hinder, delay or defraud creditors. If the fraud is not perpetrated by the debtor or the debtor's authorized agent, it cannot be the basis of an objection to the debtor's discharge."). We note that the facts in the present case might meet this standard in any event, given Helen's dementia. See footnote 7 of this opinion. As we previously indicated, the trial court in the present case never addressed the question of whether the transfer was fraudulent because it concluded that there was no transfer subject to the act.

[21] What the trial court meant when it found that Helen did not "participate" in the transfers is unclear. The trial court did not address in any manner the legal implications arising from the power of attorney agreement, and, therefore, we must assume that its references to participation meant some other facts, presumably specific direction from Helen for the defendant to make particular transfers or to take payment for a specific service rather than Helen's grant of general authority to issue checks and to take compensation/reimbursement. Insofar as the trial court relied on cases applying this participation exception to third-party transfers, without regard to agency, we do not find these cases relevant to the present case. We observe, however, that the adoption of this exception in response to policy concerns is in tension with any purported "plain meaning" of the provisions.

We similarly do not view cases from this court addressing third-party transfers under the Uniform Fraudulent Conveyance Act, the predecessor to the current act, helpful. In those cases, the court attributed the third-party transfer to the debtor and did not indicate whether different facts would warrant such attribution. See, e.g., *D.H.R. Construction Co.* v. *Donnelly*, 180 Conn. 430, 433 and n.1, 429 A.2d 908 (1980).

————————————————